**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL L.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 24 C 9328** |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **LELAND DUDEK,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed his application for Disability Insurance Benefits and Supplemental Security

Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381a, 1382c,

over seven and a half years ago in November of 2017. (Administrative Record (R.) 196-207). He

claimed that he had been disabled since August 3, 2017 (R. 196) due to a herniated disc. (R. 227).

Plaintiff's application was denied at every level of administrative review: initial, reconsideration,

administrative law judge (ALJ) (R. 17-34 833-850), and appeals council. He filed suit in federal

district court under 42 U.S.C. § 405(g), and Magistrate Judge David Weisman remanded this case

by agreed order on September 22, 2021. There was another hearing, another ALJ decision denying

plaintiff's claim (R. 757-832, 1983-2008), and plaintiff filed another suit for review in federal district

court on December 12, 2022. The case was remanded again, the plaintiff's application was denied

again (R. 1879-1913), and the plaintiff filed suit under 42 U.S.C. § 405(g) again, on October 2, 2024.

The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

October 10, 2024. [Dkt. #8]. Plaintiff again asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine status post surgery. (R. 1885). The ALJ found that the plaintiff's kidney disease was a non-severe impairment and his anxiety and depression was a non-medically determinable impairment. (R. 1885-86). The ALJ then determined that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, specifically considering Listings 1.15 (disorders of the skeletal spine) and 1.16 (lumbar spinal stenosis). (R. 1886-88).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform light work with the following limitations:

> no climbing ladders, ropes or scaffolds; no working around unprotected heights or unprotected dangerous moving machinery; occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling.

(R. 1888-89). The ALJ next summarized the medical record and plaintiff's treatment in some detail. (R. 1889-94). The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms", but that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in

2

this decision." (R. 1894). The ALJ went on to compare the plaintiff's allegations to the medical evidence. (R.1894-97).

Next, the ALJ determined that the plaintiff had no past relevant work. (R. 1898). The ALJ then relied on the testimony of the vocational expert to find that the plaintiff could perform work that existed in significant numbers in the national economy. (R. 1899). Examples of such jobs were: cashier (DOT# 211.462-010; 450,000 jobs); cafeteria attendant (DOT #311.477-014; 145,000 jobs); and cleaner (DOT #323.687-014; 235,000 jobs). (R. 1899). The ALJ overruled plaintiff's counsel's objections to the vocational expert's testimony and explained his ruling at some length. (R. 1899-1901). The ALJ also denied counsel's subpoena duces tecum for the vocational expert's materials relied on in his testimony at hearing. (R. 1899). Finally, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 1901).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether

3

substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build a "logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax", *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if,

4

while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. May 31, 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements"—an obligation that extends no further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion

enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). In this instance, the ALJ – and the VE – did enough.

### III.

The plaintiff raises three arguments in favor of another remand of this case. First, the plaintiff complains that the ALJ prematurely stopped plaintiff's counsel's cross-examination of the vocational expert and ended the hearing. [Dkt. #18-1, at 3-5]. Next, the plaintiff argues that the VE's challenged SkillTRAN testimony was neither cogent nor thorough. [Dkt. #18-1, at 5-13]. And, finally, the plaintiff takes issue with the ALJ denying plaintiff's subpoena request and how the ALJ dealt with plaintiff's Step 5 objections. [Dkt. #18-1, at 13-16]. Any other arguments the plaintiff might have raised are, of course, deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

### A.

The plaintiff claims he became disabled in August of 2017, when he was forty-one years old. (R. 196). He has been back and forth and back and forth from administrative proceedings to the district court over the course of the last seven and a half years. He has had a number of attorneys along the way. (R. 308-12, 903-06, 962-65, 988-94, 1071-82, 2058-64, 2143-52, 2322-46). He and his present counsel are back in district court asking for another remand. This time, the plaintiff has focused all his attentions on the vocational expert's testimony at the administrative hearing and the ALJ's acceptance of it to support her decision that the plaintiff is not disabled. Having waived all other arguments, the plaintiff has essentially conceded that he is able to do "light work": lifting up to 20 pounds at a time, frequently lifting and carrying up to ten pounds, and standing and/or walking

for about six hours a day. *Gedatus*, 994 F.3d at 896 n.1; *Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014). That does not sound like a person who is "disabled." Not even if the plaintiff's additional exertional restrictions – no climbing ladders, ropes or scaffolds; no working around unprotected heights or unprotected dangerous moving machinery; occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling – are considered. Not even if the statutory definition of disabled in this context – "inability to engage in *any* substantial gainful activity"(emphasis added) – is considered. 42 U.S.C. § 416(i). And, maybe not even if one considers the regulatory definition: inability to perform "[a]ny other work (jobs) that . . . exist in significant numbers in the national economy . . . ." 20 C.F.R. § 404.1560.

Under that regulatory framework, it is up to the Commissioner to show that there exist substantial numbers of jobs in the national economy that a plaintiff can actually do. *Schmitz v. Colvin*, 124 F.4th 1029, 1033 (7th Cir. 2024); *Martinez v. Kijakazi*, 71 F.4th 1076, 1079 (7th Cir. 2023). One way the Commissioner can do that is through the Medical-Vocational Guidelines. They were promulgated nearly a half century ago to:

> relieve the [Commissioner] of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress —physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a [plaintiff's] qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the [plaintiff] could perform. If such work exists, the [plaintiff] is not considered disabled.

*Heckler v. Campbell*, 461 U.S. 458, 461–62 (1983). The use of the Medical-Vocational Guidelines, or "Grid", was endorsed by the Supreme Court in 1978, *Heckler*, 461 U.S. at 467-69, and has been

used to carry the Commissioner's burden at "Step 5" ever since.

But, when a claimant has a combination of exertional limitations (like light work in this case) and postural or environmental limitations (no climbing ladders, ropes or scaffolds; no working around unprotected heights or unprotected dangerous moving machinery; occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling in this case) – the Grid can only be used as a "framework" for decision-making. 20 C.F.R. Pt. 404, Subpt. P, App. 2, §200.00(e)(2); *Haynes v. Barnhart*, 416 F.3d 621, 629 (7th Cir. 2005). And so, in this case, the ALJ noted that the combination of "light work", "younger individual", "high school education", and "no transferable skills" rendered a finding of "not disabled" per §202.20 of the Grid. (R. 1899). Indeed, even with a limitation to sedentary work, plaintiff would be found "not disabled" per §201.20 of the Grid, meaning there would be a significant number of sedentary jobs the plaintiff could do, if not for his postural and environmental limitations. Would those limitations significantly erode the sedentary job-base? It doesn't seem terribly likely that those *sedentary* jobs would require climbing ladders, working at unprotected heights, frequently climbing stairs, or frequent kneeling. So, before the vocational expert even enters the picture, again, the needle seems to point toward "not disabled."

The vocational expert, as we know, testified that there were a significant number of jobs in the national economy that a person with the plaintiff's limitations could do. He gave three examples of such jobs: 450,000 cashier jobs, 145,000 cafeteria attendant jobs, and 235,000 cleaner jobs. Intuitively, none of those numbers seem "off." There are about 350 cities with populations over 100,000 in the United States. That there are 450,000 folks working cash registers at check-outs – or tens of thousands of cafeteria and cleaner jobs – does not seemed terribly far-fetched. *See Chavez v. O'Malley*, 96 F.4th 1016, 1023 (7th Cir. 2024)("The jobs [the vocational expert] identified

and the ALJ ultimately relied on—cleaner, office helper, and storage rental clerk—are prevalent within the national economy. [Plaintiff] 'cannot credibly argue' that these jobs, which are 'commonly found in the national economy,' do not exist in significant numbers."); *Sok v. Kijakazi,* No. 21-3039, 2022 WL 17413558, at *2 (7th Cir. Dec. 5, 2022)("As for the reliability of [the vocational expert's] estimates, [plaintiff] cannot credibly argue that jobs such as cafeteria attendant or housekeeper do not 'exist in significant numbers in the national economy.'").

But, plaintiff doesn't think so. Or, at least, the plaintiff doesn't think those numbers are supported by substantial evidence. The question, though, is to what end? Let's say that plaintiff's counsel achieves the remand he is arguing for. It seems rather unlikely that, given the plaintiff's RFC and the fact that the jobs he has an issue with are "commonly found in the national economy", *Chavez*, 96 F.4th at 1023; *Sok*, 2022 WL 17413558, at *2, he will be found disabled. The exercise we are asked to undertake here appears to be academic and somewhat of a challenge given how the questioning of the VE played out; but here we are.

## B.

The plaintiff first argues that the ALJ "prematurely" ended plaintiff's counsel's cross-examination of the VE at the administrative hearing. "Prematurely" is, of course, in the eye of the beholder. The hearing in this case began at 9:40 a.m. and concluded at 11:32 a.m. (R. 1916, 1982). That's just short of two hours, and the transcript is sixty-seven pages long. Of those sixty-seven pages (R. 1939-1981), forty-two are taken up by plaintiff's counsel's questioning of the VE and debate with the ALJ. (R. 1939-1981). As the ALJ indicated, that's in the neighborhood of an hour of questioning. (R. 1901). Ending questioning after that long doesn't strike one as "premature", especially when one considers that plaintiff's hearing was likely not the only one of the day for the

10

ALJ or for the VE. Indeed, even plaintiff's counsel conceded, at the hearing, that the ALJ was "giving [him], allowing [him] a lot of room to ask questions." (R. 1967). So, really, the argument that the hearing wasn't adequate is an odd one to make.

While the plaintiff is entitled to a "full and fair hearing," that has to be tempered by the reality that Social Security disability proceedings are legion, and there are other claimants waiting patiently in the queue. This one single case may be the most important one of all those thousands of cases to plaintiff and his counsel, but it is not more important than the cases of all those other claimants. Plaintiff may not be fond of such things,[2] but, given the volume of legal proceedings at all levels, throughout all types of proceedings, there are limits. There are deadlines for filing motions and briefs. There are deadlines for discovery. There are time limits for oral arguments, all the way up to the Supreme Court. There are page limits for briefs. Time is a very limited commodity. It's in short supply. Ending the questioning of a VE at an administrative hearing after an hour is closer to "generous" than "premature," especially given the manner in which that questioning was conducted.

It has to be said that plaintiff's counsel might have gone about the questioning of the VE in a more efficient manner. Indeed, the problems might have started before the questioning even began. Based on counsel's representations to the ALJ and to the court, he was operating under the misapprehension that this case "was previously remanded for Step 5 defects." [Dkt. #18-1, at 4]. It was not. I did point out the suspect nature of the jobs cited in the previous administrative decision – marker, addresser, document preparer, *Daniel L. v. Kijakazi*, No. 22 C 6976, 2023 WL 5830807,

---

[2] Plaintiff's counsel has bumped up against such limits in these proceedings, requiring an extension of time to file his opening brief [Dkt. # 13], and then seeking leave to go beyond Local Rule 7.1's page limit, but doing so a two weeks late. [Dkt. ##5, 15, 17].

at *9-10 (N.D. Ill. Sept. 8, 2023) – and the fact that the numbers given for those positions fluctuated wildly from case to case. But, contrary to plaintiff's counsel's reading, I specifically said that:

> It's not that the number of jobs, even if one takes the lowest numbers ever estimated for the three jobs in this case, isn't necessarily a significant number. So, this isn't a basis for remand.

*Daniel L.*, No. 22 C 6976, 2023 WL 5830807, at *11. That comment seems to have been somewhat prescient, as we shall see.

In any event, setting aside the misreading of the September 8, 2023 Opinion and getting back to the length of the questioning, it has to be said that plaintiff's counsel could certainly have operated more efficiently if his goal was to attack the numbers the VE provided. Counsel said he had no objection to the VE's qualifications. (R. 1934). But, nevertheless, counsel spent the next eighteen transcript pages covering that issue which he had just waived. He asked whether the Dictionary of Occupational Titles ("DOT") included any job number statistics (R. 1939), when it's nearly common knowledge – or at least it is in the Social Security disability arena, *see, e.g., Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015); *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014) – that it does not. Then counsel asked whether the job numbers the VE provided – which were not from the DOT – were somehow from the last year the jobs in the DOT were updated, some 30 years or so ago. (R. 1940-42). No, the VE said he utilized data garnered within the previous year. (R. 1942). Then counsel gave the VE a little acronym quiz: what does OES stand for, what does SOC stand for, etc. The VE knew both of those, actually correcting plaintiff's counsel on OES. (R. 1942-43).

Then counsel, perhaps not terribly clearly, asked the VE to explain the difference in data between the OES and the SOC. (R. 1942-46). The VE said:

12

> SkillTRAN utilizes an annual OES occupational employment number that are reported nationally and statewide. The SOC is how these occupations are actually being reported. There is equal distribution and the industry between the distribution of the SOC and the OES levels and so, I am not sure what you are asking me.

(R. 1944). The ALJ wasn't sure either and asked if plaintiff's counsel was really trying to find out if the VE knew what the OES and the SOC were. (R. 1944). Plaintiff's counsel said no, he wanted to know "if there is any difference between the two data sets." (R.1945). So, the VE went into further detail:

> The OES is getting the statistics based upon the SOC, how an occupation is performed. The Standard Occupation of Classification, you know, they place the jobs in specific areas and so, is there a slight difference? Yes. You are right counselor. They can – people do look at them the same. The SOC is the Standard Occupational Classification, which is used by the federal government, in which job duties and skills are typically grouped together and they are 98 minor groups and 23 major groups and 459 broad occupations that are listed in the SOC. And so – and then when you are looking at the Occupational Employment Statistics, OES, I mean, you are looking at the statistical aspects of where you are going to place these SOC groups. And so, hopefully, you understand my response.

(R. 1945-46). Plaintiff's counsel said he did, but he wanted to know the actual differences between the two data sets. (R. 1946). The ALJ, who had been patient through the questions testing the VE's qualifications asked whether that was relevant to the actual issue of the numbers cited for the cashier, cleaner, and cafeteria jobs. (R. 1946). Plaintiff's counsel said it was relevant, but only as a foundation for further questioning about data from the Department of Labor. (R. 1946).

And so, the VE went into still further detail:

> Well, the OES has data that is self-reported by employers. The OES classifies occupations more than the census codes and so I am not sure if that answers your question. But when you are taking a look at, you know, the different types of classifications, I mean, you have occupations within the service industry and the manufacturing industry and the clerical industry, and so, you know, if I was asked a hypothetical question in regards to if an individual is unable to deal with the general public, it would rule out classifications of jobs and I would specifically look into,

> you know, occupations more within the manufacturing industry that would have an SVP of an 8 for the – it is not an SVP. But it would have a – the fifth digit would be an eight which would classify it where they are not dealing with the general public.

(R. 1947). Plaintiff's counsel yet again asked if there was a difference between the SOC and OES data and also threw in the data that the Department of Labor publishes on the ONET (Occupational Information Network). The VE asked counsel what, exactly, he was looking for and counsel said just the VE's professional opinion if there was "any Census data that is collected and published by the Department of Labor in between the three appendixes, the SOC, the OES, and the occupational numbers." (R. 1947-48).

At that point, plaintiff's counsel had seemingly lost both the VE ("I just explained to you what each was so let me –") and the ALJ ("This is getting ridiculous.") (R. 1948). So, ten transcript pages into counsel's questioning, the ALJ asked:

> [Counsel], I don't know where you are going with this. I don't know if you are actually going to attack his numbers in some way and hope that they are not accurate? Counsel: I am trying to, Your Honor. I am just asking questions.
>
> ALJ: Well, okay.
>
> Counsel: But please give me an example, Your Honor. Please give me an example of one question. I am just asking for examples of one question that I have asked that is not relevant or one question that is even border irrelevant to you. Please give me an example.
>
> ALJ: There are so many questions I don't even know what you're getting at and clearly Mr. Pagella doesn't know what you are getting at. You have gone into –
>
> Counsel: Your Honor, please give me an example of the question I asked. That is not fair for you to tell me I am asking questions that I have not detailed.

(R. 1449). It went on like that for a bit, with the ALJ trying to see if plaintiff's counsel was going to get to the issue of the accuracy of the VE's numbers, and plaintiff's counsel, curiously, stating that

the numbers:

> had nothing to do with my line of questioning and no, I am not contesting anything
> about the job I haven't brought that up numbers yet. I don't believe I am forced to go
> onto the road map. I don't think the rules have enough evidence. I will. But if they
> do, I am happy I did subpoena this information, so that we would get into addition
> whether things aren't understandable. I still would like which questions we do not
> understand, because I have tried in the past. You asked for those questions. I don't
> think I have asked a question that hasn't been able to be answered yes or no.

(R. 1951).

The ALJ then pleaded with counsel to be more direct in his questioning and, essentially, to

get to the point. (R. 1952). But, plaintiff's counsel would have none of it:

> I object to that, Your Honor. I have asked for one example of an indirect question.
> You are now calling into question my ability to just proffer. You have implied or
> inferred that I have somehow done something that is beyond the scope of what would
> be tolerable or permissible. And so, if we can't agree to some rules of the road or you
> can't specifically point me to where I have violated it, you are placing me in a very
> difficult position where I am not able satisfactorily able to advocate for my client,
> because you are hampering me from questioning the expert. You are telling me I have
> to move to the method. Well, I am trying to get there. But right now, I am just trying
> to figure out where his data came from. That is all we are trying to get to and that is
> all I have been asking and so that is exactly relevant to the method and the source.
> Everything that you asked, I was trying to attempt. But now, you have gone, and you
> are calling into substance what I am doing here and that is not fair.

(R. 1952-53).

The ALJ then agreed to give plaintiff's counsel five more minutes (R. 1953), and once those

five minutes were up, asked counsel how much more time he would need. With some conditions,

plaintiff's counsel said ten more minutes. (R. 1960). But, plaintiff's counsel went on for another

twenty or so transcript pages. At one point, the plaintiff himself had had enough and interrupted the

proceedings ordeal, and plaintiff's counsel had to settle him down:

> [Daniel L.], [Daniel L.], I got it. [Daniel L.], truly I got it. Thank you. [Daniel L.],
> I got it. Trust me, [Daniel L.]. This judge is giving me, allowing me a lot of room to

ask questions. Mr. Pagella, I am really sorry. [Daniel L.], [Daniel L.], I have got it, I have got it. I have got it. I appreciate it, [Daniel L.], if you could refrain from making a comment on the record. You know, thank you. Take your time and just allow Mr. Pagella to answer please.

(R. 1967).

To the extent we can, we'll return to the substance of the cross-examination and testimony; but, at this point, it is safe to say that the ALJ did not end anything "prematurely." An hour of questioning along the lines of what is set out in the pages of transcript – with some time out for objecting, pontificating, and quarreling – should have been more than enough to allow plaintiff's counsel to get to his point or points. Just because one has more than an hour's worth of what they deem relevant questions does not mean they have an unlimited right to ask them. The Federal Rules of Civil Procedure don't apply here but, even there, the concept of relevance is limited by proportionality. Fed.R.Civ.P. 26(b)(1). In other words, life is finite; is this worth it? Other claimants are waiting to be heard and hearing time is limited and is subsidized by taxpayers. It cannot be endless – one must try to be efficient. An hour or really, less, should have been plenty. To the extent the plaintiff asks for a remand because his lawyer did not get enough time to question the VE, that much of the plaintiff's motion is denied.[3]

---

[3] A related issue is the ALJ's denial of the plaintiff's June 8, 2024 subpoena request that "the vocational expert on June 24, 2024, to have and bring with them all privately purchased materials they will be relying upon for their potential Step 5 testimony, including any third-party software based job estimation programs such as SkillTRAN or U.S. Publishing." (R. 2160). The plaintiff argues that it was improper for the ALJ to have denied that request. Courts review an ALJ's denial of a subpoena request for an abuse of discretion. *Krell v. Saul*, 931 F.3d 582, 586 (7th Cir. 2019). That's a "highly deferential" standard. *Vega v. Chicago Park Dist.*, 12 F.4th 696, 706 (7th Cir. 2021). Under that standard, the plaintiff would have to convince the reviewing court that no reasonable person could agree with the ALJ's decision. *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 520 (7th Cir. 2024). The plaintiff has failed to do so here.

The plaintiff's position on the subpoena issue makes little sense. The heart of his position is:

"[A] claimant will not be privy to the exact sources the VE intends to use until the day of the hearing." *Djuric*, 2018 WL 4705845 * 4; *Roxbury v. Colvin*, No. 13-C-1385, 2014 WL

**C.**

As can be seen from the foregoing, plaintiff's counsel's questioning of the vocational expert in this case was lengthy and, at times, difficult to follow. There was some confusion, some quarreling, and some pontificating. But, in order to address the plaintiff's argument that the VE's testimony was neither cogent nor thorough, *see Chavez*, 96 F.4th at 1025–26; *Fetting v. Kijakazi*, 62 F.4th 332, 340 (7th Cir. 2023), we do have to sift through the forty-two pages of that questioning, confusion, quarreling, and pontificating to get a gist of the pertinent points the VE made. When those are distilled from the exchanges among plaintiff's counsel, the VE, and the ALJ, the VE's explanation of his method is "enough to instill some confidence that the estimate was not 'conjured

---

4115862, at *9 (E.D. Wis. Aug. 19, 2014). The subpoena was thus "reasonably necessary for the full presentation of a case" because how the VE used the SkillTRAN method presented "facts [that] could not be proven without issuing a subpoena" particularly since the use of the method itself was at the issue of the request reinforced at the hearing. 20 C.F.R. § 404.950(d) *Krell*, 931 F.3d 582, 587 (It is certainly best practice for vocational experts to provide underlying sources at hearings, and we encourage them to do so). Moreover, "if the VE produced the supporting data prior to the hearing, this could resolve counsel's concerns about the VE's methodology or at least counsel's questions would be more targeted." *Christopher O.*, 2022 WL 3026937, at *5. Lawrence made the ALJ aware he would test the reliability of the VE's testimony and he did test the testimony at the hearing, both of which should have given him access to the data underlying the VE's testimony he requested. *McKinnie*, 368 F.3d 907, 910–11.

[Dkt. #18-1, at 15].

The plaintiff's subpoena request asked that the VE bring materials like SkillTRAN with him to the hearing (R. 2160), so plaintiff's counsel would not have been "privy to the exact sources the VE intend[ed] to use until the day of the hearing" anyway. Counsel's questions would not have been "more targeted." The materials would not have had anything to do with counsel's questions quizzing the VE on acronyms or questions as to whether the DOT provides job statistics or repeated questions about the differences between OES and SOC. Moreover, counsel had access to SkillTRAN materials and read from some of them, and had the VE read from some of them, even though his subpoena request for such materials was not granted. Given all these points, and given the fact that plaintiff's counsel had approximately an hour to question the VE, and conceded that the ALJ gave him "lot of room to ask questions" (R. 1967), we cannot say that granting the subpoena was "reasonably necessary for the full presentation of [the] case," 20 C.F.R. § 404.950(d)(1), and certainly cannot say that no reasonable person could agree with the ALJ's decision.

out of whole cloth.'" *Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, at *3 (7th Cir. Aug. 1, 2023). Remember, the standard here is "substantial evidence" and that bar is not high. *Biestek*, 587 U.S. at 103; *Warnell*, 97 F.4th at 1052.

As noted, given the RFC the ALJ found for the plaintiff, the VE testified that plaintiff would be able to perform jobs that exist in significant numbers in the national economy. He gave three examples of such jobs: cashier, DOT #211.462-014, SVP 2, over 450,000 positions; cafeteria attendant, DOT #311.477-014, over 145,000 positions; and cleaner, DOT #323.687-014, over 235,000 positions. (R. 1935). He stated that his testimony did not conflict with the Dictionary of Occupational Titles or the Selected Characteristics of Occupations (R. 1938), which, again, he had to repeatedly assure the plaintiff's counsel did not include numbers of jobs in the economy. Vocational experts commonly rely on the DOT job classification system because the Social Security Administration regulations authorize the agency to take administrative notice of reliable job information from the DOT. See 20 C.F.R. § 404.1566(d)(1). And, as stated early, it has become fairly common knowledge that the DOT divides jobs into groups and describes particular job titles within each group, but does not provide estimates of the number of positions that exist in the national economy for each job title. *Case*, 2023 WL 4882880, at *1 n.1.

Upon further questioning from the plaintiff's counsel, the VE said, at least four times, that he arrived at his estimates for numbers of positions through his education, training, and experience placing individuals, and information from the Department of Labor and the US Census Bureau of Statistics, which he utilized through a couple of software tools, SkillTRAN and OccuBrowser Pro. (R. 1939, 1954, 1955, 1971). He explained that these were just estimates and could be nothing more because, for various reasons, there simply was no accurate source of job data available; not from the

18

government and not from private companies. (R. 1939-40). He further explained that the software tools use the annual Occupational Employment Statistics (OES) from the Bureau of Labor Statistics. (R. 1944). The OES job numbers are broken down by Standard Occupational Classifications (SOC), which were different from the OES. The SOC place jobs into areas based on how they are performed in terms of duties and skills. The VE said there are 98 minor groups, 23 major groups, and 459 broad occupations listed. (R. 1945-46). The VE provided a brief example of how the code numbers worked. (R. 1947). Thus, the VE sufficiently touched on how the two data sets differ and they have to be used together. *See, e.g., Chavez v. Berryhill*, 895 F.3d 962, 965–66 (7th Cir. 2018)(explaining that OES uses a different classification system than the DOT called Standard Occupational Codes (SOC)); *Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022)(noting that SOC codes sort jobs into broad occupational categories which encompass multiple DOT job titles); *Fetting*, 62 F.4th at 337 (noting the matching problem between the two data sets, and that vocational experts must convert the information in the OES from the SOC system to the DOT system).

The VE then reiterated for plaintiff's counsel the SVP (specific vocational preparation) numbers for the jobs he cited: 2, meaning they were unskilled. (R. 1953). He then explained that he did not necessarily perform calculations but pulled up numbers from SkillTRAN. He said, for example, there were over 1,054,000 cashier jobs of which about "20 percent of those would fit within the light level of physical tolerance, per the judge's hypothetical question and that's where you come up with the 450,000 positions." (R. 1955). The VE did not know how SkillTRAN accumulated its data, other than the fact that they did send out surveys. (R. 1956-57). Those surveys included whether jobs were full-time (35 hours a week) or part-time (fewer than 35 hours a week) (R. 1973), and one could input whether they were looking for full- or part-time positions. (R. 1974-

75).  As for any further insight into how SkillTRAN arrived at their numbers, the VE referred plaintiff's counsel to SkillTRAN.  (R. 1959).  But, of course, VEs don't need to know the precise mechanics or algorithms at work behind the SkillTRAN program, *see Chavez*, 96 F.4th at 1024–25 (7th Cir. 2024); *Case*, 2023 WL 4882880, at *3 ("[t]he inability of the vocational expert to precisely explain the software's algorithms does not render his explanation unreliable"), any more than a lawyer needs to be able to explain how Westlaw or LEXIS works in order to prepare a memorandum of law.  Such programs are simply tools they employ.

The VE was unaware whether SkillTRAN used O-NET (the Department of Labor's Occupational Network) to come up with their job numbers.  (R. 1965).  He read some of SkillTRAN's methodology from the SkillTRAN website at plaintiff's counsel's request and there was no mention of O-NET.  (R. 1964-70).[4]  There was a mention of "equal distribution" in the SkillTRAN materials insofar as SkillTRAN stated that "[t]he equal distribution that is utilized throughout the occupation is completely different from the equal distribution and the SOC and OES levels." (R. 1969).[5]  But, contrary to plaintiff's counsel's misquotation of the VE later in the back-

---

[4] It's not clear why plaintiff's counsel was asking about O-NET.  Some of the materials plaintiff's counsel cites to in his brief [Dkt. #18-1, at 7 n.3] suggest that information from that platform can't be part of the calculus:

> Occupational Information Network (O*NET) Information: O*NET does not define physical exertion requirements in a way that is consistent with SSA regulations (20 CFR 404.1567 and 416.967).  O*NET instead groups lifting with activities that SSA rules define as non-exertional (e.g., climbing, stooping, and handling).  Accordingly, the information in O*NET is not generally usable in our adjudication process.

https://secure.ssa.gov/apps10/reference.nsf/links/01062025085235AM.

[5] While plaintiff's counsel seemed to think the VE employed the equal distribution method, that wasn't clear from the VE's answers to counsel's line of questioning.  But, even if one can interpret the VE's testimony to be that he used the equal distribution method, while courts have questioned that method, they
(continued...)

and-forth, the VE never said: "After SkillTRAN there is an industry-based erosion to OES group . They use equal distribution." (R. 1978).[6]

At a couple of points during this exchange, plaintiff's counsel referred to some things he called "ERE", the "67th E file" and Venn diagrams (R. 1964-65, 1970) for the proposition that SkillTRAN *did* use O-NET. The VE allowed that he was not a statistician and could only explain so much for plaintiff's counsel as to how the numbers he employed were arrived at by statisticians. (R. 1970). Obviously, that doesn't scuttle his testimony. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009)("The witness was testifying as a vocational expert, not as a census taker or statistician."). He explained that, based on his experience, he knew there were cafeteria workers, cashiers, and packers in the economy. (R. 1970). He gained such experience over the course of a long career by assisting individuals with a wide variety of physical and/or mental limitations and placing them in positions and speaking with potential employers. (R. 1971). *See Chavez*, 96 F.4th

---

[5](...continued)
have not condemned it outright. Recently, the Seventh Circuit summed up the thinking on it, at least the thinking in the courthouse:

> While we share many concerns about the method's reliability, we have never categorically barred VEs from using that method in social security disability hearings. It is not, by itself, reversible error for an ALJ to rely on the equal distribution method—in its purest form or modified to reflect a VE's experience—to make a step-five job-number determination.

*Hohman v. Kijakazi*, 72 F.4th 248, 254 (7th Cir. 2023).

[6] Even after the ALJ submitted that the VE never said he employed equal distribution, counsel was adamant:

> He did, Your Honor. He read that into the record. He did. He did. He read that directly into the record. He said, "After SkillTRAN there is an industry-based erosion to OES group. They use equal distribution." He read that right into the record.

(R. 1978). Counsel provides no citation for the quote he attributed to the VE in his brief, and we've been unable to find it in the transcript.

at 1023 (endorsing experience in the field as a component of the reliability of a vocational expert's testimony).

Plaintiff's counsel then apparently went into the SkillTRAN program to find that there were 1,054,000 cashier positions, as the VE had said earlier, although plaintiff's counsel said SkillTRAN then adjusted that total to 898,663. (R. 1976). Counsel then stated there were 18 DOT numbers within the cashier group, but if one divided 898,000 by 18, the answer wouldn't be the VE's final estimate, which was 450,000. (R. 1976). The VE said that the exact number he came up with using SkillTRAN, OccuBrowser Pro and inputting information to get to cashier, unskilled, light, was 458,398. His experience in the field came in because he said he knew there were over 450,000 positions within the industry. (R. 1977). It wasn't clear where plaintiff's counsel came up with the method of dividing 1,054,000 or 898,663 by 18. (R. 1977-78).

In arguing that what the VE provided was neither cogent nor thorough, the plaintiff lodges a number of arguments, some of which are not supported by the record. First, the plaintiff argues that the VE did no more than cite the use of SkillTRAN for his numbers. [Dkt. #18-1, at 6]. That's obviously untrue, as the foregoing summary of the VE's testimony shows. Despite counsel's repeated attempts to perhaps trip the VE up and get him to say he only used SkillTRAN, the VE repeatedly explained that he used an amalgam of his education, training, and experience placing individuals, and information from the Department of Labor and the US Census Bureau of Statistics, which he utilized through a couple of software tools, SkillTRAN and OccuBrowser Pro. (R. 1939, 1954, 1955, 1971). Plaintiff obviously knows this, because his next contention is that the VE didn't explain how he used any of his labor market experience or knowledge to arrive at the job number estimates. [Dkt. #18-1, at 6]. But the VE did explain, giving a couple of examples of how

experience and familiarity with a job market comes into play. (R. 1939-40, 1970, 1971). The plaintiff may disagree with what the VE thinks about the local job markets, or he may think the website Indeed.com undermines the VE's experience, but even if reasonable minds could different, that's not a rationale for a remand. Nor is the plaintiff's contention – offered in spite of the VE's testimony – that the VE did not rely on his experience.

The plaintiff also complains that the VE did not adequately explain how SkillTRAN works. As summarized above, however, the VE explained a bit of the manner in which SkillTRAN compiled data and how he accessed and utilized it, especially to separate full- and part-time positions, but conceded he was no statistician and that only someone from SkillTRAN could truly offer a full explanation of how their software worked. But, the inability of the vocational expert to precisely explain the software's workings does not render his explanation unreliable. *See Fetting*, 62 F.4th at 339 (vocational expert not required to a use a market study, computer program, or publication to make his calculations); *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020) (vocational expert's testimony sufficient, though description of SkillTRAN "did not reveal the precise mechanics and statistical model involved"); *Purdy v. Berryhill*, 887 F.3d 7, 16–17 (1st Cir. 2018) (vocational expert not required to "duplicat[e] the software analysis of the basic material").

The plaintiff also challenges – in a brief, undeveloped argument – the reliability of the SkillTRAN program, but the Seventh Circuit has repeatedly affirmed ALJs' reliance on vocational expert testimony using the SkillTRAN approach. *Chavez*, 96 F.4th at 1025; *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020).[7] Next the plaintiff seems to complain about the VE "reading the

---

[7] At one point in his questioning, plaintiff's counsel suggested that a true investigation of how jobs data was accumulated and organized would require a few hours or even a few days. (R. 1959). Obviously,
(continued...)

program's method into the record when being asked about its reliability." But, it was plaintiff's counsel who prompted the VE to pull up the website. Counsel referred to what was published on the website and asked about it. (R. 1964-65). Counsel seemingly refused to share the materials he was referencing in his questioning, saying "even I referred to you the material that I am keeping." (R. 1966). The VE didn't have the website in front of him but managed to access it while counsel's questioning continued. (R.1966-67). Finally, the plaintiff complains that the VE's calculations are not a part of the record. But, the Seventh Circuit has said that it is "a bridge too far [to] suggest[] that a VE must provide exact calculations to establish this modicum of confidence. We have never required VEs to meet such a standard, and we decline to do so today." *Hohman v. Kijakazi*, 72 F.4th 248, 254 (7th Cir. 2023).

That provides a segue to the only portion of the lengthy, contentious, transcript of the VE's testimony that gives one pause. That's the question of how the VE got to the 450,000 number for cashier positions. Counsel said this was a problem because "there is 18 DOT numbers within this SOC group and so if you divide 898,000 by 18 you are not going to get 450,000. That's not just – that's not even correct math." (R. 1977). But, that wasn't the VE's math, it was counsel's math, with counsel employing the aforementioned equal distribution method using the SkillTRAN program. As previously discussed, that's not the math the VE did (R. 1955), and the VE never said *he* used the equal distribution method. (R. 1969). So, it would seem that plaintiff's counsel was forcing the equal distribution method into the proceedings in an attempt to use it as a basis for

---

[7](...continued)
if time were not finite and there were no more than a few hundred or even just a few thousand claims a year, perhaps lawyers could get into full-blown *Daubert* hearings regarding vocational expert testimony. But time is not finite, there are millions of claims each year, and neither *Daubert* nor Fed.R.Evid. 702 apply to disability claim hearings. *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020)

another remand. But, as already explained, while equal distribution has been criticized, it has never been "outlawed." *Hohman*, 72 F.4th at 254.

But, let's concede the point to plaintiff's counsel for argument's sake and say the VE used that method and his math didn't work. But, neither does plaintiff's council's math – at least not how he wants it to work. Because, while it's true that dividing 898,000 by 18 does not equal 450,000, it does equal nearly 50,000 and that is a significant number of jobs in the national economy. *Hohman*, 72 F.4th at 253 (40,000 mail clerk jobs was a significant number of jobs in the national economy). The same can be said for the other equation – the VE's equation – one can sift from the transcript. The VE employed a proportionate calculation, stating that there were 1,054,000 cashiers jobs at all levels in the national economy, and just 20 percent of those met the ALJ's hypothetical. (R. 1955). From there, the VE said he got his estimate of 450,000 jobs. Again, the math doesn't work. But, while 20 percent of 1,054,000 does not equal 450,000, it does equal 210,800 and, again, that's a significant number of jobs.[8] "At the fifth step, the Commissioner bears the burden to establish that the claimant—considering age, education, job experience, and functional capacity to work—can perform other work and that such work exists in the national economy in significant numbers." *Chavez*, 96 F.4th at 1021. That's all, and the Commissioner has managed to meet that burden here. As the ALJ explained in her opinion (R. 1900), providing an exact number is not a part of that burden. *Hohman*, 72 F.4th at 253. "A VE's estimate will be just that—an estimate. . . .The VE necessarily must approximate, and there is no way to avoid uncertainty in doing so." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018).

---

[8] The ALL took it a step further, noting that, "even if [she] were to take only 10% of the jobs [the VE] cited in the occupations cited, [she] finds the total number represents a significant number." (R. 1901).

Here, we can circle back to the previous remand order which, again, plaintiff's counsel seemingly misinterpreted.  Even the lowest of the fluctuating numbers given for the jobs cited in the previous administrative hearing were, arguably, significant numbers.  2023 WL 5830807, at *11.  Some of the jobs themselves – like marker, addresser, or microfilm document preparer – raised an eyebrow or two.  2023 WL 5830807, at *9-10.  But, that's not the case here – and we are charged with a case-by-case inquiry, *Chavez*, 96 F.4th at 1022; *Sok*, 2022 WL 17413558, at *2 – with jobs like cashier or cleaner or cafeteria attendant.  As the ALJ pointed out, these are not "isolated jobs that exist only in very limited numbers in relatively few locations outside of the region (20 CFR 404.1566)." (R. 1900).  Such jobs "are prevalent within the national economy."  *Chavez*, 96 F.4th at 1022.  Plaintiff cannot credibly argue that such "jobs, which are 'commonly found in the national economy,' do not exist in significant numbers." *Sok*, 2022 WL 17413558, at *2 (cleaner, cafeteria attendant).

There is an old line: if you ask someone what time it is, you don't want them to tell you how to build a watch.  There's a bit of that kind of thinking at work here.  If it is pitch dark out and you ask someone what time it is and they look at their watch (or, one supposes, nowadays, their phone) and they tell you it's noon, you might want to get into it with them about that watch or phone.  Saying it's noon in the middle of the night is along the lines of saying there are a significant number of nut sorting jobs or microfilm cutting jobs.  But if the sun is high in the sky and they tell you it's noon, you don't necessarily need an hour of questioning regarding their watch or phone.  It's probably close enough to noon. Saying there are a significant number of cashier jobs in the national economy is akin to saying it's noon with the sun high in the sky.  We don't necessarily need the VE to tell us how to build a watch.

26

## CONCLUSION

For the foregoing reasons, the ALJ's decision is affirmed, defendant's motion for summary judgment [Dkt. #22] is granted, and the plaintiff's Social Security Motion [Dkt. 18-1] is denied. The plaintiff's previous Social Security Motion [Dkt. #16], filed without leave of court [Dkt. #5,#15] is stricken.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/16/25